**In re TIGHE MERCANTILE, INC., a California corporation, dba Western Mercantile Co., Debtor.**

**In re Thomas Fellenz TIGHE, aka Thomas F. Tighe, Debtor.**

**Bankruptcy Nos. 85–03064–LM11, 85–01198–LM11.**

United States Bankruptcy Court, S.D. California.

July 28, 1986.

N. James Richardson, Karp & Richardson, San Diego, Cal., for debtor.

Robert D. Middendorf, Sullivan, Delafield, McDonald & Middendorf, San Diego, Cal., for Bank of America.

James P. Hill, Hill & Baskin, San Diego, Cal., for Examiner.

Victor G. Ramsauer, Levitz, Zacks & Ciceric, Inc., San Diego, Cal., Examiner.

David Puzo, Carlsbad, Cal., for Darlene Tighe.

## MEMORANDUM DECISION

LOUISE DeCARL MALUGEN, Bankruptcy Judge.

## I

### INTRODUCTION

Pursuant to this Court's order, Court-appointed examiner, Victor Ramsauer, ("Examiner") employed the law firm of Hill & Baskin ("Applicant"), in connection with his investigation of the Chapter 11 debtors, Tighe Mercantile, Inc. ("TMI") and Thomas Fellenz Tighe ("Tighe"). Applicant has filed its motion for allowance of fees and costs. TMI and Tighe have objected to this fee application on the ground that this

Court was without authority to authorize the Examiner to employ counsel.

## II

### FACTUAL BACKGROUND

On March 15, 1985, Tighe filed a petition for relief under Chapter 11 of the Bankruptcy Code. On June 28, 1985, TMI, the corporation of which Tighe was president and 25% shareholder, similarly commenced a Chapter 11 case.

Prior to the commencement of either case, the Bank of America ("Bank") filed a complaint in state court against Tighe and TMI to recover on notes each had executed in favor of the Bank.[1] On April 15, 1985, the Bank, Tighe (acting in the capacity of TMI's president) and TMI stipulated that TMI would not transfer or encumber TMI's corporate property, other than in the ordinary course of business, and that TMI would provide the Bank with bi-weekly financial statements.

On July 31, 1985, in an apparent response to financial information provided by TMI, the Bank moved this Court to appoint a trustee or examiner ("Bank's Motion"). The Declaration of Ed Sutherland, a problem loans administrator and bank vice-president, analyzed TMI's balance sheet activity from October 31, 1984 to June 28, 1985, and noted decreases in TMI's inventory that were not offset by reasonably equivalent increases in accounts receivable or cash balances. In fact, TMI's financial information reflected severe deterioration of both the accounts receivable and cash accounts. The Sutherland declaration also listed a confusing array of inter-company transactions involving TMI, Ticor Trading Company ("Ticor") and Pacific Mercantile ("Pacific"),[2] noted several inconsistences between the Tighe and TMI schedules, and revealed an unscheduled $300,000 transfer by TMI.

On August 29, 1985, TMI filed points and authorities in opposition to the Bank's Motion, and a declaration by Cheryl Hansen, TMI's bookkeeper. The Hansen declaration appeared to explain the decreases in TMI's inventory. However, the explanation of inter-company loan activity of TMI, Ticor and Pacific did not persuade the Court that these entities were acting independently. Further, an amendment to Question 14(a) of TMI's Statement of Affairs, which disclosed a previously unscheduled transfer of $300,000 to Ginder's La Jolla Sporting Goods, Inc. ("Ginder's"), caused this Court great concern.

On September 5, 1985, at the continued hearing on the Bank's Motion, this Court granted the motion with respect to appointment of an examiner, but continued it with respect to appointment of a trustee.

Pursuant to this Court's request, counsel for the Bank and TMI each tendered drafts of the proposed order appointing the examiner and detailing his duties. The draft tendered by TMI would have ordered the appointed examiner to do little other than perform those statutorily imposed duties of 11 U.S.C. § 1106(b). This Court disapproved TMI's proposed order and instead approved the more comprehensive order which the Bank tendered. The approved order imposed upon the Examiner the duties of § 1106(a)(3) and (4), " ... including but not limited to an investigation of the transactions, payments, receipts and transfers described in the Bank's [M]otion ... and such other matters as may be discovered by the [E]xaminer's investigation." In addition, the order directed the Examiner to conduct an identical investigation into the affairs of the debtor in Tighe's individual Chapter 11 case.

On November 1, 1985, the Examiner applied for court authorization to employ counsel:

1. On June 14, 1983, Tighe personally executed a continuing guaranty in favor of the Bank. On January 9, 1985, TMI executed a promissory note in favor of the Bank in the amount of $1,104,327.53 secured by accounts receivable and inventory.

2. TMI, Ticor and Pacific are wholesalers of wearing apparel and sporting shoes. Mr. Tighe owns 50% of Ticor and is a 50% general partner in Pacific. James Herbst is Tighe's partner in Pacific, and owns Ginder's La Jolla Sporting Goods, Inc. (see discussion of Ginder's, *infra*).

(a) to advise and assist the applicant [the Examiner] with his investigation into the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and the desirability of continuing such business, and (b) to advise and consult with the applicant concerning any matters relevant to the case or to the formulation of a plan of reorganization.

An order was entered authorizing the Examiner to employ general counsel;

It appearing to [this] court that it is necessary for the [E]xaminer to employ attorneys skilled in litigation and bankruptcy matters, and it further appearing that the employment of [the Applicant] is in the best interests of this estate....[3]

On November 8, 1985, the Examiner and the Applicant reviewed the First Examiner's Report with Tighe. On November 13, 1985, the Examiner filed an amended report, wherein he opined that Tighe operated TMI, Ticor and Pacific as a consolidated entity; that TMI and Ticor should be considered the same company; and, that Ticor was a transitional entity designed to bridge the operations of cash-short TMI and the recently formed non-debtor, Pacific. The center of attention, however, was the transfer of $300,000 by TMI to Ginder's during early 1985.[4] According to the Examiner's Report, Tighe told the Examiner that the $300,000 loan was designed to hinder TMI's creditors' attachment efforts. In the debtor's response, Tighe denied making this statement and contended the transfer was designed to establish a mail order business. The Examiner hypothesized that the transfer was designed to provide Ginder's with funds to capitalize Pacific. The Examiner recommended that a trustee be appointed and that, among other things, the $300,000 Ginder's transfer be avoided as a fraudulent conveyance.

The debtors countered the Examiner's recommendation by filing a plan and disclosure statement in each case. The Court did not immediately implement the Examiner's recommendation to appoint a trustee because the debtors' plans, if confirmed, appeared to provide creditors with more than they would have received upon liquidation of the estates, even with recovery of the fraudulent transfer. The Court was concerned that appointment of a trustee in a business as complex as TMI's would prejudice any reorganization effort. However, the motion to appoint the trustee was continued as an open item through the disclosure statement hearing and plan confirmation process in the event it became clear the plans could not be confirmed.

The Examiner continued to take an active role at the disclosure statement hearings, insisting the debtors disclose the inter-company transfers as potentially avoidable fraudulent conveyances. Despite these disclosures, creditors supported the plan and, on February 18, 1986, this Court confirmed Tighe's and TMI's plans of reorganization and discharged the Examiner from his duties.

TMI objects to the Application for Allowance of Fees and Costs filed by the Applicant, contending that the Bankruptcy Code ("Code") does not authorize an examiner to employ professional persons, that this Court acted outside the authority conferred upon her by the Code when she authorized

3. On November 18, 1985, an order containing identical language was entered concerning Tighe's individual case.

4. On January 17, 1985, Ginder's executed a $300,000 unsecured promissory note in favor of TMI. On the same day, Ticor disbursed $171,-424.89 to Ginder's. Ticor recorded an inter-company receivable from TMI. TMI recorded a corresponding inter-company payable to Ticor, and a note receivable from Ginder's. On January 31, 1985, and March 20, 1985, Pacific transferred a total of $78,575.11 to Ginder's. Pacific and TMI decreased their respective inter-compa-ny payable and receivable accounts with one another. TMI increased its note receivable from Ginder's by a corresponding amount. On April 1, 1985, Pacific disbursed $50,000 to Ginder's, increasing the total disbursements over the 2½ month period to $300,000. Pacific and Ticor decreased their respective inter-company payable and receivable accounts with one another. Ticor and TMI then decreased their respective inter-company payable and receivable accounts. TMI then increased its note receivable account vis-a-vis Ginder's.

the Examiner to employ Applicant and, therefore, the Examiner rather than the estate should be responsible to Applicant for its fees and costs.

## III

## ISSUE

Does the Bankruptcy Code confer upon the Court the authority to authorize examiners to employ professional persons?

## IV

## DISCUSSION

The Code permits three entities to perform reorganization labors—trustees, debtors-in-possession and examiners; however, it expressly authorizes only trustees to employ professional persons. 11 U.S.C. § 327(a)[5]. Notwithstanding the plain language of § 327(a), courts have interpreted the legislative history of § 1107(a) as extending this employment power to debtors-in-possession. See, e.g., *Matter of Triangle Chemicals*, 697 F.2d 1280, 1284 (5th Cir.1983) (interpreting H.R.Rep. No. 595, 95th Cong., 1st Sess. 404 (1977)) U.S.Code Cong. & Admin.News 1978, p. 5787. While it might be argued that the reorganization duties imposed upon examiners supports their need to employ professionals at the expense of the estate, this Court declines to adopt that rationale.

■ Section 1106(a)(1)–(7) enumerates the seven duties of a Chapter 11 trustee. Although § 327(a) gives trustees the right to employ professionals, the estate may not compensate a professional for those services which are the trustee's duty to perform. See *Matter of U.S. Golf Corp.*, 639 F.2d 1197, 1201–02 (5th Cir.1981). Therefore, it would appear that a trustee is given authority to employ counsel and other professionals to perform only those tasks which are incidental to his § 1106(a) duties.

Section 1107(a) defines the rights, powers and duties of a debtor-in-possession; in pertinent part, it provides:

... [A] debtor-in-possession shall have all the rights ... and powers, and shall perform all the functions and duties, except the duties specified in section 1106(a)(2), (3) and (4) of this title, of a trustee serving in a case under this chapter.

Section 1106(a) makes a distinction between the rights and powers of the trustee to which a debtor-in-possession succeeds, and the functions and duties of a trustee which a debtor-in-possession must perform.

■ Section 1106(b) imposes upon examiners only two of the § 1106(a) duties of a trustee; namely, the investigative and reporting duties of § 1106(a)(3) and (4).[6] A debtor-in-possession is not required to perform those duties, but nonetheless succeeds to the trustee's right to employ professionals. Therefore, the grant of authority to trustees to employ professionals to perform tasks incidental to their § 1106(a) duties must not fundamentally depend upon their need to perform those tasks incidental to their § 1106(a)(3) and (4) duties. Hence, as a matter of logic, the Court cannot infer that the mere delegation

**5.** In pertinent part, 11 U.S.C. § 327(a) provides: "Except as otherwise provided in this section, the *trustee*, with court's approval, may employ one or more ... professional persons ...." (emphasis added)

**6.** These subsections provide:
(a) A trustee shall—
\* \* \* \* \* \*
(3) except to the extent that the court orders otherwise, investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

(4) as soon as practicable—
(A) file a statement of any investigation conducted under paragraph (3) of this subsection, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate; and

(B) transmit a copy or a summary of any such statement to any creditors' committee or equity security holders' committee, to any indenture trustee, and to such other entity as the court designates;

to examiners of trustees' investigative and reporting duties confers upon examiners the concomitant right to employ professionals at the expense of the estate.

■ However, this is not the end of the enquiry. 11 U.S.C. § 105(a) authorizes the bankruptcy judge to issue orders necessary and appropriate to implement the provisions of Title 11. This Court holds that in appropriate circumstances, a bankruptcy court may rely on § 105(a) to authorize examiners to employ professional persons. Those "appropriate circumstances" may arise in two ways:

1. Where failure to permit the examiner to employ other professionals would work a hardship on a reorganizing debtor's estate; or,

2. Where the practical reality is that there is no examiner available and able to discharge all of his or her court-ordered duties without some additional, professional assistance or advice.

#### 1. *Hardship Considerations.*

The instant case is typical of a common problem which occurs when a bankruptcy court appoints an examiner who is skilled in accounting, but later realizes he needs legal advice to properly discharge his court-ordered duties. A conscientious examiner in such a position might retain counsel at his own expense.

However, for even conscientious examiners, the prospect of bearing the cost of uncompensable professional assistance may chill the depth of his or her investigation. If this inability to retain professional assistance at the estate's expense forces an examiner to resign, further difficulties arise. First, an already overburdened bankruptcy court must seek out and appoint another examiner. See § 1104(c). Second, the reappointment will force a reorganizing debtor, already in delicate financial health, to bear the cost of a new examiner becoming acquainted with the debtor's affairs.

If the financial impediments are so severe as to prevent any examiner from accepting a court appointment, the only alternative available to the bankruptcy court is to appoint a trustee who, pursuant to § 327(a), may employ the necessary professional persons.[7]

The best solution is the normative one advanced by some bankruptcy commentators: Bankruptcy courts should select examiners competent in all areas likely to arise during the course of their investigations.[8] This, however, is not always a practical solution.

#### 2. *Practical Considerations.*

The solution of appointing all-knowing examiners represents a utopian view which does not square with the practical problems faced by courts and examiners. First, persons skilled in both bankruptcy law and financial auditing are rare. This is so even in major metropolitan areas.

Also, despite all the power § 105(a) grants to bankruptcy courts, unfortunately one of them is not omniscience. Even straightforward investigations into the debtor's financial transactions and business

---

**7.** "... [V]ery often the creditors will be benefitted by continuation of the debtor-in-possession ... because ... the debtor, who is familiar with his business, will be better able to operate it during the reorganization.... [A] debtor continued in possession may lead to a greater likelihood of success in the reorganization." H.R. Rep. No. 595, 95th Cong., 1st Sess. 233 (1977) U.S.Code Cong. & Admin.News 1978, p. 6192.

**8.** Norton states that bankruptcy courts should select an examiner "with the ability to review meaningfully the books, records and transactions of the debtor." 3 Norton Bankr. L. & Prac. § 53.10 (1981). Collier states:

... [C]onsideration should be given to the fact that the Code does not provide any authority for retention by the examiner of professional persons to assist in the investigation. Therefore, if the scope of the examination will exceed the capability of an individual examiner, it would appear that the court or the United States Trustee should consider the appointment of a partnership or corporation which has the capability of conducting the requisite investigation. Among the likely candidates would be law firms and accounting firms. 5 *Collier On Bankruptcy,* Para. 1104.-04[2] (15th ed. 1986).

operations may easily mushroom into much more complex investigations. Conversely, even if sufficient numbers of examiners skilled in accounting and bankruptcy law did exist, court appointment of such a skilled person may not be appropriate in all circumstances.

■ In the present case, the Court required the Examiner to conduct an in-depth investigation into the financial dealings of TMI, Tighe and related entities. The Examiner, after conducting some investigation, discovered that he required legal advice to determine whether any of TMI's transactions were fraudulent conveyances or voidable preferences. The Court granted the Examiner's motion to employ counsel, electing the most reasonable, efficient and practical alternative that was available to her at the time.

The Court declined to appoint a trustee because she felt the debtor was essential to the reorganization.[9] The Court did not replace the Examiner with an examiner skilled in both bankruptcy law and financial auditing. First, such a person would have been extremely difficult to find in this district. Second, the net practical benefit of replacing the Examiner with a multi-talented examiner would have been minimal. Distinct legal and financial questions had arisen. Someone had to resolve them. It seemed senseless to replace the Examiner, who was already familiar with the financial transactions of the estates, with a new one, solely to ensure that the estate be billed by one person rather than two. This, in effect, is all that would have been gained.

With the above in mind, the Court authorized the Examiner to employ the Applicant. Viewed prospectively from the date of authorization, this alternative appeared optimal in terms of furthering the interests of the estate. This decision was not only necessary, but also appropriate to carry out

the provisions of § 1106(b). Therefore, this Court holds that she acted within the authority conferred upon her by § 105(a), when she authorized the Examiner to employ the Applicant.

■ This holding should not be construed as permitting examiners to employ professional persons as a matter of course. Bankruptcy courts should not authorize examiners to employ professional persons unless such authorization is necessary or appropriate to carry out the provisions of the Code. Whether such authorization is necessary or appropriate should be determined after weighing a number of factors, including the depth of the investigation ordered and the advisability of replacing the examiner with another more capable examiner or, indeed, with a trustee. The most important factor in this determination should be whether, when viewed prospectively, authorizing the examiner to employ professional persons at the expense of the estate is in the best interests of the estate.

Even after weighing these considerations, the Court may still be faced with the problem of authorizing an examiner to employ the professional person without knowing the exact services that the examiner will require the professional to provide. However, since an evidentiary hearing is required prior to estate compensation of the professional, all interested parties will have a forum in which to voice their opposition to awarding fees for services duplicative of those services which should have been performed by the examiner.

■ Therefore, the Court overrules debtors' objections to the payment of any fees and costs to Applicant. Further, the Court finds that none of the services rendered by Applicant were duplicative of those rendered by the Examiner. Accordingly, fees of $4,615 and costs of $357 are awarded to

---

9. "Generally, a trustee would not be needed in any case where the protection afforded by a trustee could equally be afforded by an examiner. Though the device of an examiner appears in current Chapter X, it is rarely used because of the nearly absolute presumption in favor of the appointment of the trustee. Its use here will give the courts, debtors, creditors and equity security holders greater flexibility in handling the affairs of an insolvent debtor, permitting the court to tailor the remedy to the case." H.R. No. 595, 95th Cong., 1st Sess. 402-03 (1977) U.S.Code Cong. & Admin.News 1978, pp. 6358, 6359.

Applicant as final compensation in these cases.

This Memorandum Decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. Applicant shall prepare an order in accordance with this Decision within ten (10) days from the date of entry hereof.